UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| MALLINCKRODT LLC, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CV-08-420-B-W |
| | ) | |
| DAVID P. LITTELL, in his capacity as | ) | |
| Commissioner of Maine Department of | ) | |
| Environmental Protection, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON MOTION TO DISMISS**

Mallinckrodt LLC, corporate descendant of a firm previously involved in the production of chemicals used in the manufacture of paper, brings this action against the Maine Department of Environmental Protection (MDEP), the Commissioner of the MDEP (Commissioner), and the Maine Attorney General (Attorney General) to enjoin enforcement of an administrative order (Order) directing remedial action at a former manufacturing facility and landfill area.[1]  Before the Court is Defendants' motion to dismiss on abstention grounds or, alternatively, for failure to state a claim.  *Defs.' Mot. to Dismiss Pls.' First Am. Compl.* (Docket # 30) (*Defs.' Mot.*).  Because the elements mandating *Younger* abstention are satisfied and no exception applies, the Court grants the motion.

---

[1] The Plaintiffs are Mallinckrodt LLC and United States Surgical Corporation.  According to the MDEP Order, Mallinckrodt Inc. was a New York corporation, which owned and operated a chloralkali manufacturing plant adjacent to the Penobscot River in Orrington, Maine.  In December 2006, Mallinckrodt Inc. merged into Mallinckrodt Holdings, Inc, a Nevada corporation, and Mallinckrodt Holdings, Inc. merged into United States Surgical Corporation, a Delaware corporation.  United States Surgical Corporation is therefore the legal successor to Mallinckrodt Inc.  In March 2007, United States Surgical Corporation and Mallinckrodt LLC entered into a Contribution and Assumption Agreement by which United States Surgical Corporation conveyed certain insurance policies to Mallinckrodt LLC, and Mallinckrodt LLC assumed potential liabilities arising from the plant site.  Mallinckrodt LLC is a subsidiary of United States Surgical Corporation, which is a subsidiary of Covidien Ltd., a corporation that is organized and exists under the laws of Bermuda.  *Compl.* (Docket # 1) at Attach. 1 at ¶ 1 (Docket # 1-2).  For simplicity, the Court refers to the Plaintiffs as Mallinckrodt.

# I.     BACKGROUND[2]

## A.     The Site

In 1967, a corporate predecessor to Mallinckrodt began operating a manufacturing facility in Orrington, Maine (the Site), adjacent to the Penobscot River. *First Am. Compl.* ¶ 50 (Docket # 29) (*Am. Compl.*).  The facility's primary purpose was to produce chemicals used in Maine's paper mills. *Id.* ¶ 60.  A byproduct of the chemical production process was brine sludge, a waste product containing mercury and other contaminants, which the facility primarily disposed in five landfills at the Site. *Id.* ¶¶ 61-63.

In 1982, the Site was sold to Hanlin Group, Inc. (Hanlin). *Id.* ¶ 52.  In 1986, the federal Environmental Protection Agency (EPA) began to take measures to address contamination near the Site. *Id.* ¶ 65.  In 1991, a corporate predecessor of Mallinckrodt entered into a Settlement Agreement with Hanlin to resolve a related lawsuit over responsibility for the contamination; the Agreement bound Mallinckrodt's predecessor to pay a portion of the investigation and clean-up costs. *Id.* ¶ 66.  In 1993, the EPA and Hanlin entered into a Consent Decree under the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. §§ 6901 *et seq.*, requiring a phased study of the Site, development of possible corrective measures, and, ultimately, final remedial measures. *Id.* ¶¶ 67-70.

In 1994, Hanlin declared bankruptcy, and the Site was sold to HoltraChem Manufacturing Company, LLC (HoltraChem); HoltraChem thereby succeeded to Hanlin's responsibilities under the Consent Decree. *Id.* ¶¶ 54, 71.  In 1997, the EPA and the MDEP entered into a Memorandum of Agreement under which the EPA retained authority for

---

[2] In accordance with standard Rule 12(b)(6) practice, the Court recites as true the facts alleged in Mallinckrodt's First Amended Complaint. *See Rodriguez-Ortiz v. Margo Caribe, Inc.*, 490 F.3d 92, 95-96 (1st Cir. 2007) (stating that a court "continues to take all factual allegations as true and to draw all *reasonable* inferences in favor of the plaintiff") (emphasis in original).

determining the remedy at the Site. *Id.* ¶¶ 75-76. From 1995 through 2000, HoltraChem and Mallinckrodt worked with the MDEP and the EPA to take remedial measures towards implementing the Consent Decree. *Id.* ¶¶ 77-85. HoltraChem ceased operation in 2000 and dissolved in 2001, leaving Mallinckrodt solely responsible for implementing the Consent Decree. *Id.* ¶¶ 55-56, 71-72.

### B.     Politicization of the Site and the MDEP Order

Following HotraChem's dissolution, Mallinckrodt continued to take steps towards implementing the Consent Decree. *Id.* ¶¶ 86-101. On May 27, 2003, Mallinckrodt completed and submitted to the MDEP and the EPA a Corrective Measures Study (CMS) evaluating remedial options for the Site. *Id.* ¶ 90. After receiving comments from the MDEP and the EPA, Mallinckrodt submitted a Revised CMS evaluating and ranking clean-up options. *Id.* ¶¶ 91-92. Among the options, the Revised CMS recommended stabilizing and capping the landfills. *See id.* ¶ 104.

On November 22, 2004, the MDEP requested that Mallinckrodt further examine two alternatives to the remedy Mallinckrodt recommended in the Revised CMS. *Id.* ¶ 99. After conducting the requested analysis, a consulting firm acting on behalf of Mallinckrodt concluded that the Revised CMS recommendation remained preferable because the two alternatives would cause unnecessary adverse environmental consequences and would endanger neighboring residences and the food chain, and, compared to the consulting firm's recommended alternative, neither remedy would more effectively reduce discharges and exposure to the public. *Id.* ¶¶ 100-01, 104. Documents generated by MDEP technical staff members indicate that they also favored stabilizing and capping the landfills. *Id.* ¶¶ 102-113.

Support for stabilization and capping was not, however, unanimous.  The Maine People's Alliance and other groups pressured the Governor's Office and the MDEP to excavate and remove all mercury from the Site.  *Id.* ¶¶ 114-17.  At a meeting on August 29, 2005 among the Governor, the Commissioner, and the Director of the MDEP's Bureau of Remediation and Waste Management, the Governor directed the MDEP to pursue this alternative remedy.  *Id.* ¶¶ 118-21. To date, no study has demonstrated that the remedy favored by the Governor, excavation and removal, will provide superior protection to the public or the environment when compared with the remedy recommended by the Revised CMS, stabilizing and capping.  *Id.* ¶¶ 123-27.

Since 2003, Mallinckrodt has implemented a multi-phase MDEP-approved plan for dismantling and removal of buildings and equipment at the Site.  *Id.* ¶¶ 128-33.  On July 2, 2008, the MDEP informed Mallinckrodt that it "was making good progress on completing the current phase of the dismantling work."  *Id.* ¶ 134.  Mallinckrodt has continued to work according to the approved plan, and there is evidence that contaminant levels at the Site are declining.  *Id.* ¶¶ 135-41.  Mallinckrodt states that "[t]here are no exigent environmental or other circumstances impacting the Site that require emergency action."  *Id.* ¶ 142.

Nevertheless, on September 11, 2008 the MDEP informed Mallinckrodt that it was about to issue an administrative compliance order requiring Mallinckrodt to implement the Governor's preferred remedy—excavation of contaminated soil at all five landfills and removal to Canada for disposal, *id.* ¶ 143, and on November 24, 2008 the Commissioner signed an order to this effect.  *Id.* ¶¶ 146-48.  The next day the Bangor Daily News ran an article reporting on the Order, *id.* ¶ 150, and the Commissioner participated in a radio interview discussing the Order.  *Id.* ¶ 151.  The Commissioner served the Order on Mallinckrodt on December 5, 2008 pursuant to 38 M.R.S.A. § 1365(1).  *Id.* ¶¶ 2, 152.

### C.    Mallinckrodt's Response

On the same date it received the Order, Mallinckrodt filed this action in federal court against the MDEP, the Commissioner, and the Maine Attorney General challenging the constitutionality of various aspects of Maine's Uncontrolled Hazardous Substances Sites Act, 38 M.R.S.A. §§ 1361 *et seq.*, and seeking an injunction to prevent Defendants from enforcing the Order and a declaratory judgment that the Order is unlawful.  *Compl.*; *Am. Compl.*[3]  Also on December 5, 2008, Mallinckrodt moved for a temporary restraining order (TRO).  *Mot. for TRO and Prelim. Inj.* (Docket # 4).  On December 8, 2008, the Court denied Mallinckrodt's TRO motion for failure to establish the potential for irreparable harm.  *Order Denying Mot. for TRO* (Docket # 14).  On December 19, 2008, Mallinckrodt filed a timely appeal of the MDEP Order with the MDEP Board of Environmental Protection (the Board) and simultaneously requested that the Board stay the administrative proceeding pending the outcome of its federal lawsuit.  *Defs.' Mot.* at Attach. 1 (Docket # 30-2); *Pls.' Mem. in Opp'n to Defs.' Mot. to Dismiss Pls.' First Am. Compl.* at 4 (Docket # 33) (*Pls.' Opp'n*).

Meanwhile, on December 31, 2008, the Defendants moved to dismiss Mallinckrodt's Complaint.  *Defs.' Mot.*  On January 9, 2009, Defendants opposed Mallinckrodt's stay request before the Board, noting that a motion to dismiss had already been filed in the federal matter.  *Pls.' Opp'n* at Attach. 1 (Docket # 33-2) (*Stay Order*).  Nevertheless, on January 16, 2009 the Board granted the stay:

> In the interest of resource economy, and without speaking to the merits of the substantive issues raised by either Mallinckrodt or the Commissioner in their filings with the U.S. District Court . . . the Board hereby grants an administrative

---

[3] Mallinckrodt's First Amended Complaint pleads six counts.  Counts One, Two, and Three are due process challenges to the state hearing process provided under the Maine Uncontrolled Hazardous Substances Sites Act. Count Four contends that enforcement of the Order is preempted by federal law.  Count Five asserts a due process violation related to the alleged politicization of the state enforcement actions.  Count Six seeks a declaratory judgment under Maine and federal law. *Am. Compl.* ¶¶ 161-213.

> stay of its proceedings in the matter of the appeal of the Commissioner's Order
> until the U.S. District Court rules on the Commissioner's motion to dismiss . . . .
> The Board will re-evaluate its schedule for this appeal proceeding following the
> Court's ruling on the motion to dismiss and determine an appropriate and timely
> course of action.

*Id.*  On January 21, 2009, Mallinckrodt filed an opposition to Defendants' motion to dismiss,

*Pls.' Opp'n*, and the Defendants replied on February 2, 2009.  *Defs.' Reply in Support of Their*

*Mot. to Dismiss* (Docket # 34) (*Defs.' Reply*).  The Court heard oral argument on May 4, 2009.

### D.    The State Administrative Process

Under the Maine Uncontrolled Hazardous Substances Sites Act, upon a finding that a

location where hazardous substances were handled "may create a danger to the public health, to

the safety of any person or to the environment," the Commissioner of the MDEP may designate

the location as an uncontrolled hazardous substance site, order "any responsible party dealing

with the hazardous substances to cease immediately or to prevent that activity and to take an

action necessary to terminate or mitigate the danger or likelihood of danger," and order "any

person contributing to the danger or likelihood of danger to cease or prevent that contribution."

38 M.R.S.A. § 1365(1).

The recipient of an order under 38 M.R.S.A. § 1365(1) "shall comply immediately," but

may also "apply to the board for a hearing on the order if the application is made within 10

working days after receipt of the order."  38 M.R.S.A. § 1365(4).  According to the statute,

> [w]ithin 15 working days after receipt of the application, the board shall hold a
> hearing, make findings of fact and vote on a decision that continues, revokes or
> modifies the order.  That decision must be in writing and signed by the board
> chair . . . and published within 2 working days after the hearing and vote.  The
> nature of the hearing before the board is an appeal.  At the hearing, all witnesses
> must be sworn and the commissioner shall first establish the basis for the order
> and for naming the person to whom the order is directed.  The burden of going
> forward then shifts to the person appealing to demonstrate, based upon a
> preponderance of the evidence, that the order should be modified or rescinded.

*Id.*

A hearing before the Board constitutes an "adjudicatory proceeding" under Maine's Administrative Procedure Act (APA), and as such, a number of procedural protections are statutorily mandated. *See* 5 M.R.S.A. §§ 8002(1), 9051; *Defs.' Mot.* at 7-8. Parties "have the right to present evidence and arguments on all issues, and at any hearing to call and examine witnesses and to make oral cross-examination of any person present and testifying." 5 M.R.S.A. § 9056(2). "Evidence shall be admitted if it is the kind of evidence upon which reasonable persons are accustomed to rely in the conduct of serious affairs"; "[w]itnesses shall be sworn"; and, "[n]o sworn written evidence shall be admitted unless the author is available for cross-examination or subject to subpoena, except for good cause shown." 5 M.R.S.A. § 9057. Parties shall be entitled "to require the attendance and testimony of witnesses and the production of any evidence relating to any issue of fact in the proceeding." 5 M.R.S.A. § 9060. The hearing is recorded, 5 M.R.S.A. § 9059, and the Board decision "shall be in writing or stated in the record, and shall include findings of fact." 5 M.R.S.A. § 9061. "Hearings shall be conducted in an impartial manner" and "[u]pon the filing in good faith by a party of a timely charge of bias or of personal or financial interest, direct or indirect, of a presiding officer or agency member in the proceeding requesting that that person disqualify himself, that person shall determine the matter as a part of the record. 5 M.R.S.A. § 9063.

The Board consists of ten members appointed by the Governor, subject to review by the joint standing committee of the Maine Legislature having jurisdiction over natural resource matters and to confirmation by the Legislature. 38 M.R.S.A. § 341-C(1). The Commissioner provides the Board with the technical services of the MDEP. 38 M.R.S.A. § 342(11-A). The Board is funded by the Board of Environmental Protection Fund (the Board Fund). 38 M.R.S.A.

§ 341-G.  The Board Fund, in turn, is funded in part by the Maine Hazardous Waste Fund, which is itself funded in part by fees imposed on the transport of hazardous waste.  *Id.*; 38 M.R.S.A §§ 1319-D, 1319-I(2).  The Maine Hazardous Waste Fund makes an annual transfer to the Board Fund capped at $325,000; however, the Board may expend money in the Board Fund only in accordance with allocations approved by the Legislature.  38 M.R.S.A. § 341-G.

A decision of the Board may be appealed to the Superior Court.  38 M.R.S.A. § 1365(4); 5 M.R.S.A. § 11001(1).  A decision of the Superior Court may be appealed to the Maine Supreme Judicial Court.  5 M.R.S.A. § 11008.  Notwithstanding the appeal provisions, a party who, "without sufficient cause," fails to act "promptly in accordance with an order . . . may be liable to the State for punitive damages in an amount at least equal to, and not more than 3 times, the amount expended by the commissioner as a result of such failure to take proper action."  38 M.R.S.A. § 1365(6).  Further, "[t]he [Maine] Attorney General is authorized to commence a civil action against any such responsible party to recover the punitive damages, which are in addition to any fines and penalties established pursuant to [38 M.R.S.A. § 349]."  *Id.*  Section 349 allows for civil penalties "of not more than $25,000 for each day of the violation" for failure to comply with the terms and conditions of a hazardous waste order.  38 M.R.S.A. § 349(2).  Criminal penalties are possible if a party "intentionally, knowingly, recklessly or with criminal negligence" violates the terms of an order.  38 M.R.S.A. § 349(1).  Any money received by the Commissioner pursuant to 38 M.R.S.A. § 1365(6) "must be deposited in the Uncontrolled Sites Fund."  38 M.R.S.A. § 1365(6).

## II.    ANALYSIS

Defendants move to dismiss all counts in Plaintiffs' First Amended Complaint (Complaint).  They argue, "[u]nder the doctrine set forth in *Younger v. Harris*, the Court should

abstain and allow the state proceedings to continue unimpeded." *Defs.' Mot.* at 1. Alternatively, "[i]f the Court does not abstain, each of the individual counts should be dismissed for failure to state a claim upon which relief can be granted." *Id.* at 1-2.

    **A.**    ***Younger* Abstention**

*Younger* abstention arises "from strong policies counseling against the exercise of . . . jurisdiction where particular kinds of state proceedings have already been commenced." *Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc.*, 477 U.S. 619, 626 (1986); *Younger v. Harris*, 401 U.S. 37 (1971). "In the absence of extraordinary circumstances, interests of comity and the respect for state processes demand that federal courts should abstain from interfering with ongoing state judicial proceedings." *Esso Standard Oil Co. v. Lopez-Freytes*, 522 F.3d 136, 143 (1st Cir. 2008) (*Esso II*). "Although initially applied to state criminal actions, the abstention doctrine has been extended to other proceedings that implicate important state interests," including state-level, quasi-judicial, administrative proceedings. *Id.*; *see also Maymo-Melendez v. Alvarez-Ramirez*, 364 F.3d 27, 31 n.3 (1st Cir. 2004).

*Younger* abstention is mandatory, not discretionary, *see Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 68 (1st Cir. 2005), when the federal lawsuit would interfere:

> (1) with an ongoing state judicial proceeding; (2) that implicates an important state interest; and (3) that provides an adequate opportunity for the federal plaintiff to advance his federal constitutional challenge.

*Rossi v. Gemma*, 489 F.3d 26, 34-35 (1st Cir. 2007); *Hartford Enters. v. Coty*, 529 F. Supp. 2d 95, 98 (D. Me. 2008). However, in "extraordinary circumstances," abstention may be inappropriate:

> Extraordinary circumstances include those situations in which 'core constitutional values are threatened during an ongoing state proceeding and there is a showing of irreparable harm that is both great and immediate.' *Maymo-Melendez*, 364 F.3d at 37 (internal quotation marks omitted). Among those extraordinary

> circumstances are cases in which extreme bias completely renders a state adjudicator incompetent and inflicts irreparable harm upon the petitioner. [*Gibson v. Berryhill*, 411 U.S. 564, 577 (1973)]; *accord Kugler v. Helfant*, 421 U.S. 117, 125 n.4 (1975) (recognizing *Gibson* bias as an example of the 'exceptional circumstances' which warrant federal intervention).

*Esso II*, 522 F.3d at 143.

### 1.      Ongoing State Judicial Proceeding

Turning to the three-part test for *Younger* abstention, the first test is met, since the proceeding before the Board is judicial in nature in that it involves "'[a] judicial inquiry [that] investigates, declares and enforces liabilities as they stand on present or past facts and under laws supposed already to exist.'" *Bettencourt v. Bd. of Registration in Med.*, 904 F.2d 772, 778 (1st Cir. 1990) (quoting *New Orleans Pub. Serv. v. Council of New Orleans*, 491 U.S. 350, 370-71 (1989) (*NOPSI*)).

The application of the second test—ongoing state judicial proceeding—is more complicated. The First Circuit has instructed that "[i]n determining whether federal proceedings would interfere with *ongoing* state proceedings, the proper point of reference is the date plaintiff filed his federal complaint." *Bettencourt*, 904 F.2d at 777 (emphasis in original). The MDEP issued its Order on November 24, 2008 and served it on Mallinckrodt on December 5, 2008. Later that day, Mallinckrodt filed its complaint in federal court and moved for a TRO. On December 8, 2008, the Court denied Mallinckrodt's motion. On December 19, 2008, Mallinckrodt appealed the MDEP Order to the Board.

The parties disagree whether the state proceeding commenced before or after the filing of Mallinckrodt's complaint on December 5, 2008, and therefore whether it was pending as of "the date plaintiff filed [its] federal complaint" under *Bettencourt*. The Defendants contend that the critical date is November 24, 2008, the date the MDEP issued the Order, and conclude there was

a state proceeding pending as of December 5; Mallinckrodt responds that the critical date is December 19, the date Mallinckrodt appealed the Order to the Board, and says there was no state proceeding as of December 5.

As the First Circuit has not squarely addressed the question, the Court turns for guidance to decisions by other courts.  The Eastern District of Virginia dealt with a similar issue in *Kim-Stan, Inc. v. Department of Waste Management*, 732 F. Supp. 646, 649-51 (E.D. Va. 1990), when it determined that a Virginia agency's issuance of an emergency order commenced the state proceeding.  However, under Virginia law, such an order required the agency hold a subsequent hearing.  *Id.* at 649-50.  Under Maine law, the issuance of an administrative order under 38 M.R.S.A. § 1365 does not mandate a subsequent hearing.  38 M.R.S.A. § 1365(4) (stating that the recipient of an order "may apply to the board for a hearing").

The Defendants also cite *Barker v. Ripley*, 921 F. Supp. 1213 (D. Vt. 1996).  Again, the facts of the case limit its usefulness.  In *Barker*, the state of Vermont brought an enforcement action against landfill operators in Vermont state court.  *Id.* at 1215.  Subsequently, a state agency issued an administrative order to the operators.  *Id.*  After receiving the order, the operators requested an administrative hearing.  *Id.*  Later, when the operators filed suit in federal court, the district court abstained under *Younger*, noting that there were "two pending state proceedings, one in superior court, and one before an administrative agency."  *Id.* at 1218.

Prior to *Bettencourt*, the Supreme Court held that *Younger* is appropriate when the state proceedings are initiated before any proceedings of substance on the merits have taken place in the federal court.  *Hicks v. Miranda*, 422 U.S. 332, 349 (1975) (holding that "where state criminal proceedings are begun against the federal plaintiffs after the federal complaint is filed but before any proceedings of substance on the merits have taken place in the federal court, the

principles of *Younger v. Harris* should apply in full force").  In *Hicks*, the Supreme Court found that denial of a temporary restraining order was not a substantial proceeding on the merits.  *Id.* at 338.

      The interplay between *Hicks* and *Bettencourt* is not obvious.  In *Wal-Mart Stores, Inc. v. Rodriguez*, addressing a similar issue, the District Court of Puerto Rico observed that the federal courts have "gradually but nonetheless with utmost caution, developed the scope of reach of the *Younger* doctrine."  236 F. Supp. 2d 200, 206-07 (D.P.R. 2002).  In *Wal-Mart Stores*, a federal action was filed several hours prior to a state court action.  *Id.* at 206.  Relying on *Bettencourt*, Judge Perez-Gimenez concluded from this fact alone that "following our Circuit's interpretation of the doctrine, our inquiry could end here."  *Id.*  Nevertheless, Judge Perez-Gimenez continued:

> When the state proceedings commence after the filing of the federal action, a court's analysis in deciding to either abstain or proceed should focus on two out of the three factors of the *Younger* abstention framework.  First, abstention is proper if the state court proceedings will provide the federal plaintiffs with an adequate opportunity to raise their constitutional challenge.  [*Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982)].  Second, the progress of the federal action must be considered and abstention is proper if the there have been no 'proceedings of substance on the merits . . . in the federal court.' *Hicks*, 422 U.S. 332, 349 (1975).

*Id.* at 207.

      Here, the *Wal-Mart* analysis favors abstention.  Mallinckrodt does not contest that it will have an opportunity to raise its constitutional challenges in ongoing state proceedings, and under *Hicks*, the Court's denial on December 8, 2008 of Mallinckrodt's motion for a TRO may not constitute a proceeding of substance on the merits.

      Further, assuming the state proceeding did not commence until December 19, 2008, almost fifteen days after the federal complaint was filed, the question is whether *Bettencourt* commands that *Younger* not apply.  The Court concludes it does not.  First, Mallinckrodt does

not contest that the Board proceeding is ongoing for the purposes of *Younger* abstention. Second, the First Circuit has counseled against an overly rigid application of the *Younger* tests. *See Maymo-Melendez*, 364 F.3d at 32 (noting that "[a]lthough *Younger* is ordinarily described as applying where the state case or proceeding is 'ongoing,' a moment's reflection suggests that this cannot be the whole story" and going on to state that "it makes little sense to ignore *Younger*'s policy simply because the state process has come to an end"). Finally, as observed in *NOPSI*, administrative proceedings that are "'judicial in nature' . . . should be regarded as 'ongoing' for the purposes of *Younger* abstention until state appellate review is completed." *NOPSI*, 491 U.S. at 374 (Rehnquist, J. concurring). As the state proceeding here is in its initial stages, this requirement is met.

Apparently conceding that the Board's stay has no effect whether the state administrative proceeding is "ongoing,"[4] Mallinckrodt argues that "[t]he bases for *Younger* abstention, federalism and comity, are lacking when a state tribunal stays its proceedings for the purpose of allowing federal resolution of the issues." *Pls.' Opp'n* at 6-7. Mallinckrodt argues that the Board granted its stay request for the purpose of deferring to the Court's decision on the pending

---

[4] Although the First Circuit has not squarely addressed whether a state proceeding remains "ongoing" despite the state issuance of a stay, courts in this District have concluded in the affirmative. *See Hartford Enters.*, 529 F. Supp. 2d at 106 (concluding that *Younger* abstention applied where the Maine Workers' Compensation Board voluntarily postponed a hearing on its complaint to await the outcome of a lawsuit in federal court to enjoin the Board proceedings); *Williams v. Me. Supreme Judicial Court Individual Justices*, 366 F. Supp. 96, 97 (D. Me. 2005) ("Plaintiff suggests that because the Law Court has now stayed its proceedings, *Younger* is no longer applicable. This Court does not agree.").

   Mallinckrodt contends that *Williams* "should not be dispositive of the issue" because that case featured "a pair of contradictory opinions" which "point in opposite directions." *Pls.' Opp'n* at 7 n.3. In the first *Williams* opinion, the district court recounts an earlier decision in which it concluded that a stay in a state court proceeding rendered *Younger* abstention inapplicable to the pending federal proceeding. *Williams v. Me. Supreme Judicial Court Individual Justices*, 350 F. Supp. 2d 136, 140-41 (D. Me. 2004). Discussing the prior decision, the court noted that "it was, and remains dubitante as to the propriety, in a technical sense, of this conclusion. It was more the result of generosity toward the Plaintiff's claims rather than any exercise of focused legal reasoning." *Id.* at 140 n.6. In the second opinion, the district court concluded that *Younger* abstention applied. *Williams*, 366 F. Supp. 2d at 97.

   The Court disagrees with the Plaintiffs' assessment that this background means that "[a]ny precedential nature of [the *Williams*] decisions is greatly limited." *Pl's Opp'n* at 7 n.3. To the contrary, the *Williams* decisions are particularly instructive because they expose the evolving thinking of a respected district court judge, who upon careful reflection, concluded that a state stay does not bar application of the *Younger* abstention doctrine.

motion to dismiss and urges that "[t]he Court should accept the Board's invitation," concluding that "[d]oing so does not evidence any interference with state sovereignty or disrespect for the state proceedings." *Id.* at 7 (citing *Sw. Air Ambulance, Inc. v. City of Las Cruces*, 268 F.3d 1162, 1178 (10th Cir. 2001)).

Mallinckrodt's argument is unconvincing. First, *Younger* abstention is founded on twin concerns: 1) the federal courts presume "the state courts are as capable as their federal counterparts of guaranteeing federal rights"; and, 2) "[r]elated to this presumption of equal competency is the concept of comity, which counsels federal courts to be sensitive to the existence of a parallel system of state governance." *Bettencourt*, 904 F.2d at 776-77. Here, the Board granted the stay under the shadow of the pending federal action, and its stay reflects the Board's concern that the federal court could judicially intervene in its administrative proceeding. *Younger* abstention is intended to alleviate the very concerns that motivated the Board's decision to stay. Far from militating in favor of federal judicial intervention, the stay, as written, weighs against it.

Second, even assuming that the voluntary relinquishment of the authority of the state to proceed should affect the *Younger* analysis, the language of the stay does not suggest that the Board has voluntarily relinquished its intention to proceed with the administrative appeal. The Board stayed its proceeding only until this Court acts on the pending motion to dismiss, and the Board's Order expressly states that it "will re-evaluate its schedule for this appeal proceeding . . . and determine an appropriate and timely course of action." *Stay Order*. The Board's Order merely stays Board action until the resolution of this motion and contemplates further action by the Board regardless of this Court's decision.

Finally, under First Circuit law, so long as the three *Younger* abstention elements are met, abstention is mandatory absent exceptional circumstances. *See Rullan*, 397 F.3d at 68. The Board's decision to stay its proceedings does not fall within one of the exceptional circumstances and the Court's obligation to abstain under *Younger* is not discretionary.[5]

### 2.    Important State Interest

As to the second *Younger* element, the state interest must be defined broadly: "we do not look narrowly to its interest in the *outcome* of the particular case—which could arguably be offset by a substantial federal interest in the opposite outcome. Rather, what we look to is the importance of the generic proceedings to the State." *NOPSI*, 491 U.S. at 365 (emphasis in original); *Hartford Enters.*, 529 F. Supp. 2d at 99.

Here, Defendants argue that Maine "has an important interest in the health and safety of its citizens, including enforcing its environmental laws and protecting citizens from potential environmental hazards like the facility issue here." *Defs.' Mot.* at 7. Mallinckrodt counters that the Board proceeding "is not entirely about those interests," but rather "is also about the Governor's unconstitutional interference in the remedy selection." *Pls.' Opp'n* at 5. According to Mallinckrodt, "[t]here can be no important state interest in permitting the Governor to violate due process by exceeding his constitutional powers, usurping the Department's authority, and injecting political factors into decisions with regard to the clean-up." *Id.* Specifically, Mallinckrodt claims that the important state interest requirement has not been met with respect to

---

[5] Even if abstention were optional, the Court is unconvinced that concerns of comity are erased by a Board decision to temporarily stay its hearing process in "the interest of resource economy" pending resolution of a federal motion to dismiss. Unlike *Southwest Air Ambulance*, where the state court decided *sua sponte* to stay the state proceeding, the stay here was sought by Mallinckrodt and there is no indication that it was otherwise desired by the Board. Finally, to forge ahead with the federal action would imply an unwarranted view that the state proceedings cannot provide Mallinckrodt adequate and fair adjudication of its claims. *See Rullan*, 397 F.3d at 70 (noting that "*Younger* applies only when the relief asked of the federal court 'interferes' with the state proceedings" and "interference . . . clearly exists where the plaintiff is seeking a declaratory judgment that a prosecution, or the statute serving as its basis, is illegal or unconstitutional").

Count Five, which alleges that "[t]he Governor has selected the remedy contained in the Order in violation of Mallinckrodt's due process rights." *Am. Compl.* ¶ 208.

Mallinckrodt relies heavily upon *Addiction Specialists, Inc. v. Township of Hampton*, 411 F.3d 399 (3d Cir. 2005). In *Addiction Specialists*, a company seeking to open a drug counseling clinic sued a Pennsylvania township which had ruled that local zoning ordinances prohibited the clinic. *Id.* at 402-03. The company's complaint challenged the legality of Pennsylvania's land use policies and alleged that the township officials' application of those policies was unconstitutional and violated federal law. *Id.* at 410. The Third Circuit concluded that the district court erred by treating all the company's claims equally in conducting its analysis under the second prong of the *Younger* abstention test. *Id.* However, the *Addiction Specialists* Court noted that under Third Circuit precedent,

> even if the federal claims at issue do not themselves implicate important state interests, certain aspects of the requested relief may potentially interfere with the state proceeding. Specifically, a grant of injunctive relief in federal court may result in a *de facto* review of the township's zoning decisions currently under review in the state courts. In other words, even though many of [the company's] claims do not directly involve important state interests, abstention may still be appropriate if a federal injunction preventing the Township from acting in a discriminatory manner would have the effect of enjoining state proceedings that do involve important state interests.

*Id.* at 410 (citations and quotations omitted).

Here, the validity of the Order, including the manner in which the clean-up remedy was selected, is now before the Board. Federal review of the lawfulness of the Order at this juncture, not to mention a federal injunction or a declaratory judgment that the Order is unlawful, would necessarily interfere with the Board's ongoing review of the Order, a state proceeding which implicates important state interests related to public health and the environment.

**3.      Adequate Opportunity to Advance Federal Constitutional Challenges**

For the purposes of the third *Younger* element, "it is sufficient . . . that constitutional claims may be raised in state-court judicial review of the administrative proceeding." *Ohio Civil Rights Comm'n*, 477 U.S. at 629.   Mallinckrodt may have the opportunity to present its constitutional challenges during the administrative proceedings before the Board.   *See* 5 M.R.S.A. § 9056(2) (stating that parties to adjudicatory proceedings have "the right to present evidence and arguments on *all* issues" (emphasis added)).   If Mallinckrodt receives an unfavorable ruling from the Board, it has the right to appeal the decision to the Maine Superior Court, 38 M.R.S.A. § 1365(4); 5 M.R.S.A. § 11001(1), and, if necessary, may appeal the Superior Court decision to the Maine Law Court, 5 M.R.S.A. § 11008.   The Superior and Supreme Courts certainly may address Mallinckrodt's federal claims.   *See Hartford Enters.*, 529 F. Supp. 2d at 98.   Mallinckrodt does not dispute that it will have an opportunity to advance its federal constitutional challenges if the Court abstains.   The third element of *Younger* abstention is satisfied.

### B.     Bias

As all three *Younger* elements are satisfied, abstention is required unless an exception applies.   *See Rullan*, 397 F.3d at 68; *Hartford Enters.*, 529 F. Supp. 2d at 98.   Mallinckrodt argues that the allegations in its Complaint trigger the bias exception first articulated in *Gibson v. Berryhill*, 411 U.S. 564, 577 (1973).   *Pls.' Opp'n* at 7-8.   Under the exception, there must be "extreme bias completely render[ing] a state adjudicator incompetent and inflict[ing] irreparable harm upon the petitioner."   *Esso II*, 522 F.3d at 143.   Mallinckrodt contends that "political interference, the use of Department staff to advise the Board at the same time that it prosecutes the O[r]der that it prepared and wrote, the reliance on the Attorney General's office as counsel

for both, and the fact that upholding the remedy will fund both the Board and the Department constitute an exceptional level of bias." *Pls.' Opp'n* at 7-8.

###### 1.    *Gibson v. Berryhill*

In *Gibson*, an organization of independent practitioner optometrists filed charges with the Alabama Board of Optometry (ABO) against several optometrists who were salaried employees of a corporation. *Gibson*, 411 U.S. at 567-68. The gravamen of the charges was that practicing optometry for a corporation rather than independently was unlawful under Alabama law. *Id.* The optometrist employees filed suit in federal district court seeking to enjoin the ABO hearings. *Id.* The district court granted the injunction, finding the ABO impermissibly biased for two reasons: first, the ABO itself had filed a complaint in Alabama state court alleging charges substantially similar to those to be adjudicated before the ABO; and, second, the ABO members, solely independent practitioners, had personal pecuniary interests in the outcome of the proceedings. *Id.* at 578. The Supreme Court affirmed on the basis of the pecuniary interest bias without reaching the state proceeding-related bias. *Id.* at 578-79.

###### 2.    *Esso*

Recently, the First Circuit affirmed a finding of *Gibson* bias in an environmental case. *Esso II*, 522 F.3d at 150. In *Esso II*, the Puerto Rico Environmental Quality Board (EQB) sought to impose a $76 million fine on the Esso Standard Oil Company (Esso) for 550 gallons of spilled fuel. *Id.* at 140. Esso sought an injunction in federal court, arguing that the EQB was biased. *Id.* at 140-41. The district court dismissed the case pursuant to *Younger*, despite expressing serious concern with undisputed evidence of bias. In *Esso Standard Oil Co. (P.R.) v. Mujica Cotto*, 389 F.3d 212 (1st Cir. 2004) (*Esso I*), the First Circuit affirmed because Esso had failed to demonstrate irreparable harm. *Esso II*, 522 F.3d at 140-41. Specifically, the First Circuit found

that Esso could seek interlocutory relief from the Puerto Rico courts.  *Id.* at 141.  Subsequently, Esso unsuccessfully sought interlocutory review in the Puerto Rico courts, returned to federal court, and this time attained an injunction.  *Id.* at 141-42.[6]

*Esso II* involved allegations of both structural and actual bias.  *Id.* at 141, 145-48.  First, under Puerto Rico law, the proposed penalty of $76 million would go directly into an account administered at the complete discretion of the EQB.  *Id.* at 146-47 (characterizing the proposed fine as "unprecedented and extraordinarily large" and noting that the sum was twice the EQB's annual operating budget and 5,000 times greater than the largest fine it had ever imposed). Second, the Hearing Examiners presiding over administrative hearings and making fine recommendations to the EQB were independent contractors paid a fixed hourly rate out of the same account into which fines were deposited and were dependent on the EQB for case assignments, thus rendering them vulnerable to temptation to make recommendations favorable to the EQB.  *Id.* at 147.  Third, there was evidence that the Puerto Rico Senate had threatened criminal prosecution of EQB officials for failure to timely respond to the gasoline spill.  *Id.* at 148.  Taken as a whole, the First Circuit concluded that there was "a strong appearance of bias and, additionally, undisputed evidence of actual bias in these proceedings."  *Id.*[7]

### 3.    Mallinckrodt's Allegations

---

[6] Under *Esso I*, to secure federal intervention, Mallinckrodt must demonstrate irreparable harm.  This requires that Mallinckrodt show that it is unable to attain interlocutory relief from Maine courts.  *Esso I*, 389 F.3d at 221-25; *Esso II*, 522 F.3d at 141.  Maine law provides a mechanism for interlocutory review of agency actions in certain circumstances.  *See* 5 M.R.S.A. § 11001(1) ("Preliminary, procedural, intermediate or other nonfinal agency action shall be independently reviewable only if review of the final agency action would not provide an adequate remedy."); *see also Ne. Occupational Exchange, Inc. v. Bureau of Rehabilitation*, 473 A.2d 406, 408-10 (Me. 1984). Mallinckrodt concedes that thus far it has failed to show that this mechanism is unavailable, arguing instead that this action should be stayed to allow it to test whether it has an interlocutory remedy in state court.  *Pls.' Opp'n* at 8. However, such a stay is unnecessary unless the risk of bias is sufficiently extreme to qualify for the *Younger* exception.

[7] The district court earlier concluded that "the evidence submitted by Esso is not only undisputed, it is overwhelming.  The appearance and the probability of actual bias cannot be ignored. . . . Clearly, the EQB does not measure up to the yardstick of what an impartial adjudicator should be in accordance with Due Process."  *Esso I*, 389 F.3d at 224.

Mallinckrodt alleges both actual and structural bias.  *Pls.' Opp'n* at 7-8; *Am. Compl.* ¶¶ 172-95.  It alleges that the Board and the MDEP share the same legal team, *Am. Compl.* ¶¶ 177-81, and the same technical staff, *id.* ¶¶ 182-89; that the Board (along with the MDEP) has a financial interest in the outcome of Mallinckrodt's appeal and the selected remedy, *id.* ¶¶ 190-92; that 38 M.R.S.A. § 1365 creates an unconstitutional presumption that the MDEP Order is valid by placing the burden of proof on appeal on Mallinckrodt, *id.* ¶ 193; and, that the Governor's interference constitutes actual bias, *id.* ¶ 194.

### a.   Legal Team Overlap

Mallinckrodt argues that "[b]ias exists because the [MDEP] (the prosecutor) and the Board (the judge and jury) share the same lawyers."  *Pls.' Opp'n* at 12.  Mallinckrodt claims that the same attorneys within the Natural Resources Division of the Maine Attorney General advise both the MDEP and the Board, and that the attorney currently representing the MDEP in this matter has in the past advised the Board on other matters.  *Am. Compl.* ¶ 178.  Mallinckrodt says that the attorneys report to the same supervisor.  *Id.* ¶ 179.  According to Mallinckrodt, the Attorney General's Office lacks sufficient staff with substantive knowledge of environmental laws to maintain a firewall between the attorney representing the MDEP and the attorney advising the Board.[8] *Id.*

"Without a showing to the contrary, state administrators 'are assumed to be men of conscience and intellectual discipline.'"[9] *Withrow v. Larkin*, 421 U.S. 35, 55 (1975) (quoting *United States v. Morgan*, 313 U.S. 409, 421 (1941)).  This presumption extends to assistant attorneys general.  *See Hladys v. Commonwealth*, 366 S.E.2d 98, 100 (Va. 1988) ("The official

---

[8] At oral argument, the Assistant Attorney General represented that, even though two assistant attorneys general report to the same division chief, the Office has maintained a wall between them.
[9] At oral argument, the attorney for Mallinckrodt confirmed that there is no allegation of unethical conduct by any of the assistant attorneys general.

conduct of assistant attorneys general is entitled to a presumption of honesty and fairness no less than that accorded to the acts of other public officials.  In the absence of a showing of bias or improper conduct on their part, we will assume that their conduct was proper and that the impartiality of the tribunal was unimpaired.").

In 1989, the Maine Law Court discussed the special role played by the Maine Attorney General.  *Superintendent of Ins. v. Attorney Gen.*, 558 A.2d 1197, 1202 (Me. 1989) ("Because of the multiple duties imposed on the office, the status of the Attorney General is unique"). *Superintendent* involved, *inter alia*, a "narrow issue":  "If an agency is represented in court by independent private counsel, is it ethically permissible for the Attorney General to seek judicial review of an administrative decision of that agency, even though the agency was counseled by members of his staff during the administrative proceeding?"  *Id.* at 1202.  After reviewing the special ethical considerations of governmental practice, the Law Court answered in the affirmative:

> In sum, we conclude that when the Attorney General disagrees with a state agency, he is not disqualified from participating in a suit affecting the public interest merely because members of his staff had previously provided representation to the agency at the administrative stage of the proceedings.  Other less drastic means of insuring effective representation for state officers and agencies exist.

*Id.* at 1204.  The Law Court endorsed and quoted "the practical resolution" adopted in *State ex rel. Allain v. Miss. Pub. Serv. Comm'n*, 418 So. 2d 779, 784 (Miss. 1982), where the Mississippi Supreme Court observed that "[t]he attorney general has a large staff which can be assigned in such manner as to afford independent legal counsel and representation to the various agencies." *Superintendent* at 1204.  In sum, in *Superintendent*, the Law Court endorsed the flexibility of the Attorney General to respond to the complex demands of the office.

Mallinckrodt's allegations of systematic bias must be measured against this legal backdrop. Even though on a motion to dismiss, the Court is required to assume the truth of the plaintiff's allegations, here, at bottom, Mallinckrodt is complaining that different assistant attorneys general are simultaneously representing the MDEP and the Board. This is exactly the type of solution contemplated in *Superintendent*, and the Court rejects the proposition that bald assertions that the Office of the Attorney General lacks sufficient personnel to maintain a firewall are sufficient to undermine its adequacy or create an appearance of bias.[10]

### b.    Technical Staff Overlap

Mallinckrodt protests the sharing of technical staff between the MDEP and the Board, alleging that "[t]he Board relies for technical advice on the very agency staff that wrote the Order and will prosecute it before the Board." *Pls.' Opp'n* at 11-12; *Am. Compl.* ¶¶ 182-89. Specifically, it contends that the Board utilizes MDEP staff, typically the same staff involved in drafting MDEP orders, to review and analyze technical arguments made before the Board, *Am. Compl.* ¶ 183; that the MDEP has no scientific or technical staff of its own, *id.* ¶ 184; that the only MDEP staff members familiar with the Site are those who were involved in drafting the Order, *id.* ¶185; that the Board has an established pattern and practice of obtaining technical advice from the MDEP staff involved in the decisions contained in the Order, *id.* ¶ 186; that the MDEP staff who will likely serve as the Board's technical advisors will also be witnesses in the appeal, *id.* ¶187; that even if the Board identified only previously uninvolved staff the political manner in which the Order was selected infuses the entire MDEP staff with bias, *id.* ¶ 188; and,

---

[10] Other courts have come to similar conclusions. *See, e.g.*, *Wash. Med. Disciplinary Bd. v. Johnston*, 663 P.2d 457, 465 (Wash. 1983) (deciding that the assignment of a single assistant attorney general to both prosecute a case and advise the hearing officer would impair at least the appearance of fairness of the tribunal, but that the potential problem would be resolved by the appointment of different attorneys general for the performance of disparate functions); *Hladys*, 366 S.E.2d at 99-100 (holding that "the institutional connection between . . . two assistant attorneys general . . . did not, *per* se, impair the right of [the plaintiff] to procedural due process").

that the MDEP neither has formal nor informal rules of conduct regarding *ex parte* contacts between MDEP staff and the Board regarding issues on appeal, *id.* ¶ 189.

Mallinckrodt quotes *Withrow* for the proposition that "when review of an initial decision is mandated, the decisionmaker must be other than the one who made the decision under review." *Pls.' Opp'n* at 12.  This is not the situation here.  According to the Complaint, the decision to issue an Order was made by the Commissioner under pressure from the Governor. *See Am. Compl.* ¶¶ 118-20, 148-49.  Indeed, the MDEP technical staff preferred the same remedy as Mallinckrodt.  *Id.* ¶¶ 102-13.  Pursuant to 38 M.R.S.A. § 1365(4), the decisionmaker on appeal will be the Board.  Mallinckrodt's argument seems to be that, because the MDEP technical staff drafted the Order, it is as if the staff issued the Order, and because the Board relies on the technical staff for advice, it is as if the technical staff will make the Board's decision on appeal.  This theory both attributes more influence to the technical staff than the allegations in the Complaint support and unjustifiably discounts the ability of the Board to fairly assess the reliability and credibility of its advisors.

Mallinckrodt's Complaint indicates that the MDEP technical staff was involved in investigating and drafting the Order and will be involved in an advisory capacity in adjudicating the Order.[11]  Under *Withrow*, however, absent other evidence of bias, similar dual roles are constitutionally permissible when held by adjudicators:

> The contention that the combination of investigative and adjudicative functions necessarily creates an unconstitutional risk of bias in administrative adjudication has a much more difficult burden of persuasion to carry.  It must overcome a presumption of honesty and integrity in those serving as adjudicators; and it must convince that, under a realistic appraisal of psychological tendencies and human weakness, conferring investigative and adjudicative powers on the same individuals poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented.

---

[11]  At oral argument, the Defendants represented that under 5 M.R.S.A. § 9055, no one from the MDEP will be permitted to give technical advice to the Board outside the formal adjudicatory process.

421 U.S. at 47; *Pathak v. Dep't of Veterans Affairs*, 274 F.3d 28, 33 (1st Cir. 2001) (stating that "[p]arties advancing due process arguments based on a combination of investigative and adjudicative functions, and the decision maker's bias allegedly resulting therefrom, have a very difficult burden of persuasion to carry"). In terms of structural bias, Mallinckrodt's allegations fail to raise a cognizable issue. As for actual bias, as with their administrative colleagues, the Court presumes in the first instance the staff's integrity and honesty, and there is no allegation that the staff adjusted professional conclusions on the basis of political considerations in the past, and no basis to infer that they will do so in the future.[12]

### c.     Financial Interest

According to the Complaint, the Board and the MDEP have a financial interest in the outcome of Mallinckrodt's appeal. *Am. Compl.* ¶ 190. Specifically, if the remedy proposed by the Order is implemented, Mallinckrodt alleges that it would generate $14.4 million in fees which would, in part, go into the coffers of the Board and the MDEP. *Id.* ¶¶ 191-92; *Pls.' Opp'n* at 4 n.2.

The parties have provided scant information on the funding of the MDEP. As for the Board, Maine law provides that it is funded by the Board of Environmental Protection Fund (Board Fund), 38 M.R.S.A. § 341-G, which is funded in part by several other funds, including the Maine Coastal and Inland Surface Oil Clean-up Fund, 38 M.R.S.A. § 551, the Ground Water Oil Clean-up Fund, 38 M.R.S.A. § 569-A, and the Maine Hazardous Waste Fund, 38 M.R.S.A. 1319-D. *Defs.' Mot.* at 10-11. The Hazardous Waste Fund is funded in part by fees imposed on the transport of hazardous waste. 38 M.R.S.A. § 1319-D. The annual transfer to the Board Fund

---

[12] When questioned at oral argument, Mallinckrodt's counsel acknowledged that the technical staff had concurred with Mallinckrodt's position, and conceded he did not know whether the staff changed their recommendation after Governor Baldacci made his position known.

from the Hazardous Waste Fund is capped at $325,000 per year, and Board Fund money may only be expended in accordance with allocations approved by the Maine Legislature. 38 M.R.S.A. § 341-G. Members of the Board are volunteers and receive a legislative per diem for attendance at Board meetings and hearings, meal allowances, and travel expenses. 5 M.R.S.A. § 12004-D(2); 38 M.R.S.A. § 341-C(6).

In *New York State Dairy Foods, Inc. v. Northeast Dairy Compact Commission*, 198 F.3d 1, 13 (1st Cir. 1999), the First Circuit described the due process concern attendant to personal pecuniary interests:

> When an adjudicator has a direct, personal, and substantial pecuniary interest in the outcome of a case, due process is abrogated. *See Tumey v. Ohio*, 273 U.S. 510, 523 (1927). Not every interest, however, is substantial enough to amount to a violation of due process. In one formulation, an interest is substantial if it 'would offer a possible temptation to the average . . . judge to . . . lead him not to hold the balance nice, clear and true . . . .' *Ward v. Village of Monroeville*, 409 U.S. 57, 60 (1972); *see also Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 822 (1986). Participation of adjudicators who 'might conceivably have had a slight pecuniary interest,' however, does not offend due process. *See Aetna Life Ins. Co.*, 475 U.S. at 825.

Later, in *Esso I*, it addressed institutional bias:

> [A] pecuniary interest need not be personal to compromise an adjudicator's neutrality. *See United Church of the Med. Ctr. v. Med. Ctr. Comm'n*, 689 F.2d 693, 699 (7th Cir. 1982) ('The Commission has a pecuniary interest in the outcome of the reverter proceedings, because . . . in the event of a subsequent sale of the property, the proceeds redound to the coffers of the Commission. This is sufficient under the [*Gibson v.*] *Berryhill* rule to mandate disqualification of the Commission . . . and require that the reverter proceedings provisions of the statute be held unconstitutional.'); *see also Ward v. Village of Monroeville*, 409 U.S. 57, 59-60 (1972) (concluding that the city mayor was an unconstitutionally biased adjudicator where fines he imposed for traffic offenses provided a substantial portion of village funds).

389 F.3d at 219.

Mallinckrodt makes no claim that the individual Board members, volunteers all, have a personal pecuniary interest in the remedy selected at the Site. This distinguishes Mallinckrodt's

claim from *Gibson* and *Esso*.  In *Gibson*, the independent optometrists comprising the ABO stood to gain personally from the exclusion of employee optometrists from their state.  *Gibson*, 411 U.S. at 578.  In *Esso*, the Hearing Examiners who presided over administrative hearings and made recommendations to the EQB Governing Board were independent contractors who signed one-year contracts and were paid a fixed hourly rate.  *Esso II*, 522 F.3d at 147.  As a Hearing Examiner's continued employment and total pay was entirely at the discretion of the EQB Governing Board, the Examiner had a personal financial incentive to make recommendations favorable to the EQB.  *Id.*

*Esso* also involved institutional bias.  The First Circuit noted that "the EQB Governing Board members [were] salaried and thus [had] no *personal* pecuniary interest in the fines imposed and collected by the agency."  *Id.* at 146 (emphasis in original).  Nevertheless, the EQB Governing Board had an institutional interest in levying fines because any collected fines were deposited in a Special Account over which the EQB Board had complete discretion:

> [T]his is a case in which the EQB has complete discretion over the usage of those funds which are supplied, at least in part, by fines which it imposes.  In this particular case, the possibility of temptation is undeniable and evident in the fact that the size of the proposed fine in this case is so unprecedented and extraordinarily large.  The $76 million proposed fine—a sum twice the EQB's annual operating budget and 5,000 times greater than the largest fine ever imposed by the EQB—only intensifies the appearance of bias infecting the proceedings.

*Id.* at 146-47 (contrasting the circumstances from "a situation in which the EQB Governing Board is so removed from the financial policy of the Special Account that . . . a presumption of bias is inapplicable").

The *Esso* Court cited a trio of Supreme Court cases involving due process challenges and mayors in Ohio, the most recent of which Mallinckrodt refers to approvingly in its memorandum. *Id.* (citing *Tumey v. Ohio*, 273 U.S. 510 (1927), *Dugan v. Ohio*, 277 U.S. 61 (1928), and *Ward v.*

*Vill. of Monroeville*, 409 U.S. 57 (1972)); *Pls' Opp'n* at 13.  In *Tumey*, the Supreme Court reversed convictions for prohibition law violations rendered by the mayor of North College Hill, Ohio.  In addition to his regular salary, the mayor personally received a portion of the fees and costs he levied against alleged violators.  *Id.* at 531-32.  In addition to this personal pecuniary interest, the *Tumey* Court based its decision on the mayor's "official motive to convict and to graduate the fine to help the financial needs of the village."  *Id.* at 535.

*Dugan* also involved prohibition law violations and fines imposed in a mayor's court, this time in Xenia, Ohio.  *Dugan*, 277 U.S. at 62.  However, this time the Supreme Court affirmed the convictions.  *Id.* at 65.  Unlike *Tumey*, the mayor of Xenia received a salary not dependent on whether he convicted in any given case.  *Id.*  The mayor had no executive duties and "[h]is relation . . . to the fund contributed to by his fines as judge, or to the executive or financial policy of the city, [was] remote."  *Id.*

Most recently, *Ward* involved a challenge to an Ohio state statute authorizing mayors to sit as judges in cases involving ordinance violations and traffic offenses.  *Ward*, 409 U.S. at 57-58.  As in *Tumey*, the Supreme Court reversed a Supreme Court of Ohio judgment upholding convictions, this time in Monroeville, Ohio.  Unlike *Tumey*, in *Ward*, the mayor did not have a personal pecuniary interest in conviction.  *Id.* at 59-60.  However, similar to *Tumey*, a substantial portion of Monroeville's funds was derived from penalties the Mayor imposed, so much so that "when legislation threatened its loss, the village retained a management consultant for advice upon the problem."  *Id.* at 58.  The Supreme Court described the possible temptation that "may . . . exist when the mayor's executive responsibilities for village finances may make him partisan to maintain the high level of contribution from the mayor's court."  *Id.* at 60.

Mallinckrodt also relies on *United Church of the Medical Center v. Medical Center Commission*, 689 F.2d 693 (7th Cir. 1982). *Pls.' Opp'n* at 13. *United Church* involved a dispute between a church and a commission created by the Illinois legislature to establish, monitor, and expand a medical center within Chicago. *Id.* at 695. In the 1950s, the commission deeded a parcel of land to a predecessor of the church. *Id.* Twenty years later, after several unsuccessful attempts by a hospital to acquire the church's land, the commission adopted a resolution authorizing a title reverter proceeding to be held before it. *Id.* at 696. The church filed suit in federal court to enjoin the reverter proceeding, arguing that the commission was biased. *Id.* at 696-97. By statute, all money received by the commission from the sale of property was deposited into a Medical Center Commission Income Fund. *Id.* at 698-99.

The Seventh Circuit agreed with the Church that this arrangement gave the commission, which served as the judge in reverter proceedings, a direct financial stake in the outcome of the proceedings:

> In this case the Commission has a pecuniary interest in the outcome of the reverter proceedings, because if the Commission finds a nonuse or disuse, the property reverts to the Commission, without cost to the Commission even though the property has valuable improvements on it, and in the event of subsequent sale of the property, the proceeds redound to the coffers of the Commission. This is sufficient under the [*Gibson*] rule to mandate disqualification of the Commission in the reverter proceeding, and require that the reverter proceedings provisions of the statute be held unconstitutional.

*Id.* at 699. It summarized, "[i]n simple terms the particular evil is that the [statute] permits the Commission to award valuable property to itself without compensation and without due process." *Id.* at 700 (noting that changes in Illinois law "provide[d] the Commission with greater authority to retain and spend the money generated by a sale of property").

Mallinckrodt argues "[t]he fact that the Board (and the Department) stand to gain a sum that would be enough [to] pay 100 percent of the Board's total budget for 30 or more years

28

*without any other funding* is enough, standing alone, to demonstrate financial bias of constitutional dimensions." *Pls.' Opp'n* at 13 (emphasis in original).  However, any fees derived from the Order will be deposited in the Hazardous Waste Fund, a fund which, unlike *Esso II* and *United Church*, the Board does not control.  While a portion of any fees in the Hazardous Waste Fund might then be transferred to the Board Fund, this transfer is capped by law at $325,000 per year.  There is no reason to infer that, absent fees derived from the Order, the Board Fund will fail to receive its statutorily allowed annual appropriation.  Finally, unlike *Esso II* and *United Church*, the Board's ability to allocate the $325,000 is circumscribed by the statutory requirement that the funds only be expended in accordance with allocations approved by the Legislature.

*Ward* is similarly unavailing.  Here, there is no allegation about what percentage of the MDEP or the Board's funds derive from fees associated with the transportation of hazardous waste.  More importantly, unlike *Ward*, there is no cause to find that the Board members have executive responsibilities for MDEP or Board finances that might motivate partisanship.  The allegations are closer to *Dugan*, where the mayor had no executive duties and "[h]is relation . . . to the fund contributed to by his fines as judge, or to the executive or financial policy of the city, [was] remote."  *Dugan*, 277 U.S. at 65.

Under Maine law, the Board's relation to the funds possibly raised by the Order is remote.  While the Board conceivably could have an interest in selecting a remedy with substantial financial upside for the state, the individual Board members have no apparent personal financial interest in such a result, and any institutional interest is minimized by a statutory scheme strictly limiting the Board's receipt and control over funds possibly derived from the Order.  Given these circumstances, the Court cannot infer impermissible bias.  *See New*

*York State Dairy Foods, Inc.*, 198 F.3d at 13 ("Not every interest . . . is substantial enough to amount to a violation of due process.").

### d.      Burden of Proof

Mallinckrodt contends that 38 M.R.S.A. § 1365 "places the burden of proof on appeal on Mallinckrodt, creating an unconstitutional presumption that the Order is valid and a bias against the appellant." *Am. Compl.* ¶ 193.   However, under the relevant statutory provision, at the commencement of a Board hearing "the commissioner shall first establish the basis for the order and for naming the person to whom the order is directed." 38 M.R.S.A. § 1365(4).  Only once a basis is established does the burden "shift[] to the person appealing to demonstrate, based upon a preponderance of the evidence, that the order should be modified or rescinded." *Id.*

The Supreme Court has stated that "[o]utside the criminal law area, where special concerns attend, the locus of the burden of persuasion is normally not an issue of federal constitutional moment." *Lavine v. Milne*, 424 U.S. 577, 585 (1976); *United States v. $250,000 in United States Currency*, 808 F.2d 895, 900 (1st Cir. 1987) ("Generally, Congress may alter the traditional allocation of the burden of proof without infringing upon the litigant's due process rights unless the statute is criminal in nature.").[13]   Mallinckrodt cites *Pactiv Corporation v. Chester*, 455 F. Supp. 2d 680 (E.D. Mich. 2006), and *Chemical Waste Management v. United States Environmental Protection Agency*, 56 F.3d 1434 (D.C. Cir. 1995).  Both cases involved concern about potential due process violations where an administrative scheme shifted the burden from the government to the subject of an administrative order.  *Pactiv*, 455 F. Supp. 2d at 690; *Chemical Waste Management*, 56 F.3d at 1438.  In both, the burden shift was one factor

---

[13] At oral argument, Mallinckrodt argued that *$250,000 in United States Currency* is inapposite because it is a forfeiture case.  The Court finds no indication that the First Circuit intended its statement regarding the general burden shifting rule to be so limited.

among many.   Neither case involved an administrative hearing where the government was required to establish the basis for an order before the burden shifted.

### e.        Gubernatorial Involvement

Finally, Mallinckrodt contends that the Governor's interference in the Order issuance process constitutes actual bias, and that this bias extends to the Board because the MDEP and the Board are "inextricably intertwined."  *Am. Compl.* ¶ 194; *Pls.' Opp'n* at 14.

Again, *Esso II* is instructive.  There, a Puerto Rico Senate Commission report threatened criminal prosecution of EQB officials for failure to timely deal with a gasoline spill.  *Esso II*, 522 F.3d at 148.  The First Circuit concluded that the threat was evidence of actual bias in the EQB proceedings.  *Id.*  Unlike *Esso II*, there are no allegations that the Governor has made any threats, either to the Board or the MDEP.  Indeed, there is no indication that the Governor has had any contact at all with the Board, or that anyone, including the Commissioner, has contacted any member of the Board on the Governor's behalf.  Further, in *Esso II*, the EQB, the threatened party, had ultimate authority to approve or reject imposition of the $76 million fine.  Here, the Board, not the MDEP nor the Commissioner, has the authority to make the final agency determination.[14]

Mallinckrodt's conclusory allegation that the MDEP and the Board are one in the same and therefore the Board is tainted by any and all biases of the MDEP and the Commissioner is both insufficient to overcome the presumption that the Board operates fairly and with integrity, *see Withrow*, 421 U.S. at 47; *Brooks v. N.H. Supreme Court*, 80 F.3d 633, 640 (1st 1996) ("[t]he

---

[14] Similar to *Esso*, where appointment to the EQB required consent from the Puerto Rico Senate, the Governor appoints members to the Board.  38 M.R.S.A. § 341-C.  Thus, the Board members are to some degree beholden to the Governor for their positions.  *See Esso II*, 522 F.3d at 148 (stating that "[t]he fact that the appointment of EQB members requires Senate consent further intensifies the incentives felt by the EQB to impose an unduly heavy fine on Esso").  However, as the Board members are unpaid volunteers, Mallinckrodt has alleged no reason the members would fear gubernatorial action on their appointment or reappointment.

presumption of judicial impartiality cannot be trumped by free-floating invective, unanchored to specific facts"), and unsupported by the Board's conduct to date.  Mallinckrodt's success, over MDEP objection, to attain a stay of the state administrative proceeding pending resolution of this motion in federal court supports an inference that the Board is capable of operating independently and willing to reject MDEP requests in favor of Mallinckrodt.

Mallinckrodt cites a number of cases to support its claim that the Governor's involvement with the remedy selection process violated due process.  *See Pls.' Opp'n* at 16-20.  All but one of these involved allegations of federal executive or legislative entanglement with a federal agency or federally-created body.  *See D.C. Fed'n of Civic Ass'ns v. Volpe*, 459 F2d 1231 (D.C. Cir. 1971) (congressional involvement with the Department of Transportation); *Pillsbury Co. v. Federal Trade Comm'n*, 354 F.2d 952 (5th Cir. 1966) (congressional involvement with the Federal Trade Commission); *Sokaogon Chippewa Cmty. v. Babbitt*, 929 F. Supp. 1165 (W.D. Wis. 1996) (congressional and executive involvement with the Department of Interior); *ATX, Inc. v. United States Dep't of Transp.*, 41 F.3d 1522 (D.C. Cir. 1994) (congressional involvement with the Department of Transportation); *Jarrott v. Scrivener*, 225 F. Supp. 827 (D.D.C. 1964) (executive official involvement with the federally created Board of Zoning Adjustment); *Portland Audubon Soc'y v. Or. Lands Coal.*, 984 F.2d 1534 (9th Cir. 1993) (executive  official involvement with the Endangered Species Committee); *Koniag, Inc. v. Andrus*, 580 F.2d 601 (D.C. Cir. 1978) (congressional involvement with the Department of the Interior); *DCP Farms v. Yeutter*, 957 F.2d 1183 (5th Cir. 1992) (congressional involvement with the Department of Agriculture); *Peter Kiewit Sons' Co. v. U.S. Army Corps of Eng'rs*, 714 F.2d 163 (D.C. Cir. 1983) (congressional involvement with the Department of Defense).  The exception is a Hawaii

case involving gubernatorial entanglement with the Hawaii Commission on Water Resource Management.  *In re Water Use Permit Applications*, 9 P.3d 409 (Haw. 2000).

The extent to which these cases apply to allegations of gubernatorial involvement with a state agency in Maine is an open question.  Assuming they do, they fail to support the allegations of bias here, predominantly because Mallinckrodt's allegations insufficiently link the Governor's alleged involvement in the remedy selection process to the Board or the Board's adjudicatory process.  *See ATX*, 41 F.3d at 1527-28 (stating that "judicial evaluation of the pressure must focus on the *nexus* between the pressure and the actual decision maker" and "congressional actions not targeted directly at the decisionmakers . . . do not invalidate an agency decision"); *Sokaogon Chippewa Cmty.*, 929 F. Supp. at 1174-75 (same); *Peter Kiewit Sons'*, 714 F.2d at 169-70 ("[T]he proper focus is not on the content of congressional communications in the abstract, but rather upon the relation between the communications and the adjudicator's decisionmaking process.").

Without this link, no inference of bias adheres, *see Koniag*, 580 F.2d at 610 (denying a due process claim where "none of the persons called before the subcommittee was a decisionmaker"); *In re Water Use Permit Applications*, 9 P.3d at 435-36 (noting that "[i]n the absence of evidence of direct communication with the decisionmakers, [a party] fails to demonstrate the requisite 'nexus between the pressure and the actual decision maker'" (quoting *ATX*, 41 F.3d at 1527)), and the cases involving direct communication with the decisionmaker are inapposite.  *See, e.g.*, *Jarrott*, 225 F. Supp. at 829 (involving senior federal executive branch officers contacting members of the District of Columbia Board of Zoning Adjustment); *Pillsbury*, 354 F.2d at 955-65 (involving United States Senators communicating with Federal Trade Commissioners); *D.C. Fed'n of Civic Ass'ns*, 459 F2d at 1235-36 (involving a United

States Representative pressuring the Secretary of Transportation); *Portland Audubon Soc'y*, 984 F.2d at 1546 (involving allegations of White House staff communicating with the Endangered Species Committee).[15]

While "the appearance of bias or pressure may be no less objectionable than the reality," *D.C. Fed'n of Civic Ass'ns.*, 459 F.2d at 1246-47, Mallinckrodt's allegations, focused as they are on communication between the Governor and the Commissioner and the MDEP staff during the remedy selection process, not the Board, fail to raise the specter of bias in the pending Board proceeding.[16]

## III.    CONCLUSION

Mallinckrodt's various allegations do not allow an inference of "extreme bias completely render[ing] a state adjudicator incompetent and inflict[ing] irreparable harm upon the petitioner." *Esso II*, 522 F.3d at 143.  The Court concludes that the *Younger* elements are satisfied and that no "extraordinary circumstance" exception applies.  The Court abstains before reaching the merits of Mallinckrodt's suit.

The Court GRANTS Defendants' Motion to Dismiss (Docket # 30).

---

[15] Even if the Commissioner, not the Board, were the final decisionmaker, the timing of the Governor's contact with the Commissioner, well before the initiation of the hearing process, raises another issue.  *See DCP Farms*, 957 F.2d at 1187 (concluding that "the congressional communication here was not aimed at the decision-making process of any quasi-judicial body" in part because "the contact here occurred well before any proceeding which could be considered judicial or quasi-judicial").

[16] At oral argument, Mallinckrodt cited *Kirschner v. Klemons*, 225 F.3d 227 (2d Cir. 2000), for the proposition that even if the Board is not biased, the Governor's bias is sufficient to preclude *Younger* abstention.  In *Kirschner*, the Second Circuit collapsed the biased adjudicator and bad faith prosecution *Younger* exceptions.  *Id.* at 236-37; *see Esso II*, 522 F.3d at 143 ("Generally, insofar as the state proceedings evince no showing of *bad faith, harassment, or some other extraordinary circumstance* that would make abstention inappropriate, the federal courts should abstain. . . .  Among those extraordinary circumstances are cases in which *extreme bias* completely renders a state adjudicator incompetent." (internal citations and quotations omitted) (emphasis added)).  At least until oral argument, Mallinckrodt had appealed only for the bias exception.  *See Pls.' Mot.* at 7 ("The Complaint Triggers the *Younger* Bias Exception.").  In any event, Mallinckrodt's allegations fail to allow an inference of bad faith prosecution.  *See Huffman v. Pursue, Ltd.*, 420 U.S. 592, 611 (1975) ("*Younger* . . . do[es] of course allow intervention in those cases where the District Court properly finds that the state proceeding is motivated by a desire to harass or is conducted in bad faith."); *Brooks*, 80 F.3d at 640-41 (finding that an investigation of attorney misconduct did not trigger the bad-faith exception because the investigation "[was] not an enforcement proceeding brought without any realistic expectation of finding a violation of a rule").

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 20th day of May, 2009